UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| AMANDA GOODING, | : | CIVIL ACTION NO. |
|    Plaintiff, | : | 3:11-cv-856 (JCH) |
| | : | |
| v. | : | |
| | : | |
| WALGREENS HOME CARE, INC., | : | JULY 2, 2013 |
|    Defendant. | : | |

**RULING RE: MOTION FOR SUMMARY JUDGMENT (Doc. No. 57)[1]**

**I.    INTRODUCTION**

Plaintiff Amanda Gooding ("Gooding") commenced this action against defendant Walgreens Home Care, Inc. ("Walgreens"[2]), her former employer. The Complaint alleges four counts. Counts 1 and 3 claim that Walgreens discriminated against Gooding on the basis of her pregnancy in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII") and the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60(a), et seq. (the "CFEPA"). Counts 2 and 4 claim that Walgreens discriminated against Gooding on the basis of her gender in violation of Title VII and the CFEPA. Walgreens has filed a Motion for Summary Judgment on all counts.

**II.    STATEMENT OF FACTS**

Walgreens began operations at its Distribution Center in Windsor Locks, Connecticut, in January 2009. Def.'s Local Rule ("L.R.") 56(a)1 Stmt. (Doc. No. 55) ¶ 2.

---

[1] The defendant originally filed a Motion for Summary Judgment (Doc. No. 53), but filed a corrected Motion for Summary Judgment (Doc. No. 57), to correct the name of the person filing the Motion. In light of the filing of the corrected Motion, this court terminated Doc. No. 53 as moot. See Doc. No. 73. For the purposes of this Ruling, the court treats Doc. No. 57 as the operative Motion and treats all documents filed in support of Doc. No. 53 to have been filed in support of Doc. No. 57.

[2] The defendant states that its proper name is Walgreen Eastern Co., Inc., not Walgreens Home Care, Inc. The court will refer to the defendant hereinafter as "Walgreens."

Gooding commenced work at the Distribution Center in July 2009.  Id. ¶ 5 (stating that Gooding started work "on or about July 16, 2009"); Pl.'s L.R. 56(a)2 Stmt. (Doc. No. 67-1) at 1 (admitting that Gooding started work in July 2009, but alleging that she was hired on July 9, 2009).  After undergoing orientation, which covered Walgreens' policies and procedures, she was assigned to the Shipping Department and given the job title General Warehouse Person.  Def.'s L.R. 56(a)1 Stmt. ¶¶ 6–7.  Gooding's position, which involved loading merchandise into trucks, required that she be able to "perform tasks which include pushing, pulling, grasping, and lifting with or without accommodation," and that she be able to "carry up to 50 pounds with or without reasonable accommodation."  Id. ¶ 8 (quoting General Warehouse Person Job Description (Doc. No. 56-1), Ex. 2 to Def.'s Mot. Summ. J. (Doc. No. 57)).

      Walgreens' policy and practice is to give periodic reviews to employees in new jobs or job assignments during the first forty-five days of that employee's new job or job assignment (the "Initial Review Period").  The purpose of the Initial Review Period is to determine whether the employee is performing up to expectations.  Id. ¶ 9.  Walgreens' policy is to administer these reviews on or about the fifteenth, thirtieth, and forty-fifth days of the Initial Review Period.  Id. ¶ 10; see Pl.'s L.R. 56(a)2 Stmt. at 2 ¶ 10 (admitting existence of policy, but denying that policy is applied to each employee).  Under "exceptional circumstances," an employee who fails to achieve the expected performance level may have his or her Initial Review Period extended if there is reason to believe that the employee will achieve the expected level of performance within a reasonable period of time.  Def.'s L.R. 56(a)1 Stmt. ¶ 11.  Walgreens' policy is to terminate employees who fail to meet the expected performance level during the Initial

2

Review Period, or, if applicable, during an additional extended period.  Id. ¶ 12; see Pl.'s L.R. 56(a)2 Stmt. at 2 ¶ 12 (admitting existence of policy, but denying that policy is applied to each employee).  Gooding received favorable evaluations at each review during her Initial Review Period for her job at the Shipping Department.  Def.'s L.R. 56(a)1 Stmt. ¶¶ 13–15.

Sometime during her employment at Walgreens, Gooding became pregnant.  She informed her supervisors about her pregnancy in September 2009.  Id. ¶ 16.  Approximately one week later, Gooding submitted a doctor's note that, among other things, restricted the amount Gooding could lift or move to twenty-five pounds.  Id. ¶ 18.  Based on this restriction, Gooding could not continue in her job at the Shipping Department, which regularly required her to lift and move things in excess of her medically imposed restrictions.  Id. ¶ 19.

On or about September 25, 2009, Walgreens transferred Gooding to the AKL Department in order to accommodate her work restrictions.  Id. ¶ 20.  Work in the AKL Department involved "picking" specified items from bins and placing them in totes on a conveyer belt.  Once filled by the employees, the totes would move to the Shipping Department to be delivered to stores.  Id. ¶ 22.  The work in the AKL Department did not require lifting things in excess of Gooding's medically imposed restrictions.  Id. ¶ 21.

Rate and accuracy of work are critical for the AKL Department.  Substandard performance by one AKL Department employee affects the performance of other AKL Department employees and can result in logistical problems such as loading delays in the Shipping Department, delivery truck departure delays, and accrued overtime expenses.  Id. ¶¶ 23–25.  Accordingly, the AKL Department employs "rate" and

"accuracy" objectives for each AKL Department employee. These objectives are adjusted based on the area within the AKL Department to which the employee is assigned. Employees' rate and accuracy ratings are posted daily and factored into their performance evaluations. Id. ¶ 23.

At the time Gooding was transferred into the AKL Department, her immediate supervisor was Function Manager Heather Petro ("Petro"). Petro was pregnant when Gooding transferred into the AKL Department and left shortly thereafter on maternity leave. Id. ¶ 26. Function Manager Doug Mills then became Gooding's direct supervisor. Id. ¶ 27.

On October 6, 2009, Gooding received a Counseling for failing to comply with Walgreens' attendance policy and procedure. Id. ¶ 29. Gooding admits to receiving the Counseling, but denies certain of the alleged violations. Pl.'s L.R. 56(a)2 Stmt. at 3 ¶ 29. On October 13, 2009, Gooding submitted and received approval for a flex-time request to attend a doctor's appointment. Def.'s L.R. 56(a)1 Stmt. ¶ 30.

On October 16, 2009, Gooding received her fifteen-day progress report. The report showed that Gooding met her accuracy rate goal for two out of three weeks. Pl.'s L.R. 56(a)2 Stmt. at 9 ¶ 12. However, the report also showed that her productivity was 82.9%, 25.48%, and 55.04% of her goal for those three weeks. Def.'s 56(a)1 Stmt. ¶ 31.

On or about October 20, 2009, Walgreens received a note from Gooding's physicians stating that Gooding had a "normal pregnancy" and that she was able to lift fifty pounds. Upon receipt of the note, Walgreens initiated a transfer of Gooding back to the Shipping Department. Id. ¶¶ 33–34. Gooding then had Walgreens contact her

physicians, after which her physicians submitted another note stating that Gooding could not lift, carry, or move anything more than twenty pounds. Id. ¶ 35.

On or about October 21, 2009, Gooding met with Alison Rose ("Rose"), a Human Resource Generalist at Walgreens. At that meeting, Gooding signed a Transitional Duty Notification Form. Additionally, Gooding and Rose discussed Walgreens' unpaid leave of absence plan. Id. ¶ 36. That evening, after the meeting, Gooding contacted Rose to inquire whether Gooding could apply for unemployment benefits while on unpaid leave of absence. Rose told Gooding that an employee on an approved leave of absence remains an active employee, and that an application for unemployment would be considered a resignation by that employee. Id. ¶ 37 (citing email correspondence between Gooding and Rose (Doc. No. 56-1), Ex. 13 to Def.'s Mot. Summ. J.).

On October 28, 2009, Gooding received a First Written Reprimand for failing to comply with Walgreens' attendance policy and procedures. Id. ¶ 38.

On November 3, 2009, Gooding received her thirty-day progress report. The report showed that Gooding met her accuracy rate goal for all three weeks. Pl.'s L.R. 56(a)2 Stmt. at 10 ¶ 14. However, the report also showed that her productivity ranged from 64% to 80% of her goal for those weeks. Def.'s 56(a)1 Stmt. ¶ 39; Pl.'s 56(a)2 Stmt. at 4 ¶ 39 (admitting that Gooding's productivity rate "ranged from 64% to 80% during her 30 day progress report").

On November 24, 2009, Gooding received a Final Written Reprimand for failing to comply with Walgreens' attendance policy and procedures. Def.'s 56(a)1 Stmt. ¶ 42. Gooding admits to receiving the reprimand, but denies certain of the alleged violations. Pl.'s L.R. 56(a)2 Stmt. at 4 ¶ 42.

On November 27, 2009, Gooding received her forty-five-day progress report. The report showed that Gooding met her accuracy rate goal for those last three weeks. Pl.'s L.R. 56(a)2 Stmt. at 5 ¶ 43. However, the report also showed that her productivity was at 76%, 64%, and 48.4% of her goal for those weeks. Def.'s 56(a)1 Stmt. ¶ 43; Pl.'s 56(a)2 Stmt. at 5 ¶ 43 (admitting that Gooding's productivity rate "ranged from 48.4% to 76% during her 45 day progress report").

During the Initial Review Period, Gooding's productivity never reached her expected rate. Afterward, Walgreens declined to provide Gooding with an extension and removed Gooding from the AKL Department. Def.'s 56(a)1 Stmt. ¶¶ 45, 47–48. Rather than terminating Gooding, as was its policy, Walgreens offered Gooding the option of taking a leave of absence until she delivered her child, after which she could return to her former job in the Shipping Department. Id. ¶¶ 49–50. During the leave of absence, Gooding would not be paid a salary but would be provided medical benefit coverage.[3] Id. ¶ 51.

Gooding did not fill out or submit the leave of absence paperwork. Id. ¶ 53. On or about February 12, 2010, Walgreens sent Gooding a letter informing her that, effective December 4, 2009, she had been "administratively separated" from Walgreens. Id. ¶ 56; Pl.'s 56(a)2 Stmt. at 6 ¶ 56 (admitting that Walgreens terminated Gooding).

## III.    STANDARD OF REVIEW

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such

---

[3] Gooding did not qualify for a paid leave of absence because she had worked for Walgreens for less than six months. Def.'s L.R. 56(a)1 Stmt. ¶ 51.

6

issue warrant judgment for the moving party as a matter of law." In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009). Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Id. In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. See Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment." United Transp. Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009). Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)); see also Havey v. Homebound Mortg., Inc., 547 F.3d 158, 163 (2d Cir. 2008) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)) (stating that a non-moving party must point to more than a mere "scintilla" of evidence in order to defeat a motion for summary judgment).

**IV.    DISCUSSION**

Walgreens argues that it is entitled to summary judgment regarding Gooding's claims because Gooding has failed to establish a prima facie case of gender or

7

pregnancy discrimination; or alternatively, because Gooding cannot show that Walgreen's termination of her was pretextual or done with discriminatory intent.

   A.  Pregnancy Discrimination

In Counts 1 and 3, Gooding claims that Walgreens subjected her to pregnancy discrimination in violation of Title VII and the CFEPA.  "Title VII prohibits discrimination against any individual with respect to his or her compensation, terms, conditions, or privileges of employment, because of, inter alia, such individual's sex."  Kaytor v. Electric Boat Corp., 609 F.3d 537, 546 (2d Cir. 2010) (internal quotation marks and alterations omitted) (quoting 42 U.S.C. § 2000e-2(a)(1)).  Congress passed the Pregnancy Discrimination Act (the "PDA"), which "made clear that, for all Title VII purposes, discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex."  Newport News Shipbuilding and Dry Dock Co. v. E.E.O.C., 462 U.S. 669, 684 (1983); see 42 U.S.C. § 2000e(k) ("The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy . . . .").  The PDA also provides that "women affected by pregnancy . . . shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work."  Id.

Claims alleging pregnancy discrimination under Title VII are subject to the three-step burden-shifting analysis originally established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Kerzer v. Kingly Mfg., 156 F.3d 396, 400–01 (2d Cir. 1998).  Under the McDonnell Douglas framework, an employee bears the initial burden of showing, by a preponderance of the evidence, a prima facie case of discrimination.  Id. at 401.  An employee can establish a prima facie case of pregnancy

8

discrimination under Title VII by showing that: (1) she is a member of a protected class; (2) she satisfactorily performed the duties required by her position; (3) she was terminated; and (4) the termination occurred in circumstances giving rise to an inference of unlawful discrimination. Id. (citing Quaratino v. Tiffany & Co., 71 F.3d 58, 64 (2d Cir. 1995)).

If the employee demonstrates a prima facie case of discrimination, then a presumption that the employer unlawfully discriminated against the employee is raised, and the burden "shifts to the employer to articulate a legitimate, clear, specific[,] and non-discriminatory reason for discharging the employee." Id. (internal quotation marks and citation omitted). Notably, the employer "is not required to prove that the articulated reason actually motivated its actions." Farias v. Instructional Sys., Inc., 259 F.3d 91, 98 (2d Cir. 2001); see also Ortiz v. Prudential Ins. Co., 94 F. Supp. 2d 225, 234 (D. Conn. 2000) (noting employer's "light" burden). Once the employer has articulated such an explanation, the burden shifts back to the employee to prove, by a preponderance of the evidence, that "the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination." Kerzer, 156 F.3d at 401.

The CFEPA also prohibits employers from discriminating against employees on the basis of gender, see Conn. Gen. Stat. § 46a-60(a)(1), or to terminate an employee because of her pregnancy, id. § 46a-60(a)(7). Moreover, "CFEPA claims are governed by the same standards applicable to Title VII claims." Jamilik v. Yale Univ., 362 Fed. Appx. 148, 150, 151 n.3 (2d Cir. 2009). Accordingly, the court will analyze Gooding's Title VII and CFEPA pregnancy discrimination claims together. See Hall v. Family Care

9

Home Visiting Nurse and Home Care Agency, LLC, 696 F. Supp. 2d 190, 198–199 (D. Conn. 2010) (analyzing Title VII and CFEPA pregnancy discrimination claims together).

1. Prima Facie Case

Walgreens argues that Gooding cannot meet the fourth element of her prima facie case—that her employment was terminated under circumstances giving rise to an inference of discrimination.[4]  Gooding argues that the "events leading up to and the context surrounding the discharge" provide "evidence on the part of [Walgreens] that gives rise to an inference of discrimination."  Pl.'s Mem. in Opp. to Def.'s Mot. Summ. J. (Doc. No. 67-4) ("Pl.'s Opp.") at 13–16.  The court concludes that a reasonable jury could not find that Gooding was terminated under circumstances giving rise to an inference of discrimination.

First, the evidence, rather than creating an inference of discrimination, suggests that Walgreens attempted to accommodate Gooding.  Gooding admits that Walgreens transferred her to the AKL Department to accommodate lifting restrictions arising from her pregnancy.  Def.'s L.R. 56(a)1 Stmt. ¶ 20.  Even after she failed her Initial Review Period in the AKL Department, Walgreens gave her the option of taking leave during her pregnancy.  Id. ¶¶ 49–50.  Although Gooding did not qualify for paid leave, she would have retained her medical benefits.[5]  Id. ¶ 51.

---

[4] Walgreens does not appear to contest the first three elements.  See Def.'s Mem. Mot. Summ. J. (Doc. No. 54) at 16–17.

[5] Gooding appears to claim that there existed a "tote audit job" in the "tote audit department," and that she was able to perform this job satisfactorily.  Pl.'s Opp. at 2–3.  However, Gooding never argues how this fact, if it were true, is evidence of discrimination.  Moreover, there was no Tote Audit Department where Gooding could have worked full-time.  Gooding acknowledges that Tote Audit is an assignment in the Shipping Department into which employees in that Department rotate as required.  July 18, 2012 Deposition of Amanda Gooding (Doc. No. 56-3) at 70–71.

Second, Walgreens' treatment of Gooding during her Initial Review Period in the AKL Department does not raise an inference of discrimination. Gooding admits that, although she met her accuracy goals during that time, she never met her productivity goals. Id. ¶ 45. Specifically, her productivity rates were as follows: 82.9%, 25.48%, and 55.04% of target at her fifteen-day review; 64%, 80%, and 71% of target at her thirty-day review; and 76%, 64%, and 48.4% of target at her forty-five day review. See Initial Review Period Progress Reports, Exs. 10, 15, 18 to Def.'s Mot. Summ. J. The evidence in the record shows a general downward trend in her productivity. Her highest rate occurred during her first week, and her last three weeks showed declines down to under 50% in her last week. Nonetheless, Gooding argues that her treatment at the AKL Department supports an inference of discrimination because certain of her non-pregnant coworkers in the AKL Department who exhibited similar performances during their Initial Review Periods were either given additional time to meet their target rates or were not required to complete their Initial Review Periods at all. See Pl.'s Opp. at 14–16 (mentioning coworkers Carlos Flores, Cathleen Higgins, Blerim Gashi, Juan Castillo, and Teresa Dixon).[6]

The evidence in the record does not support this claim. Each coworker Gooding mentions had a productivity rate that trended upward during the Initial Review Period and ended up significantly higher than Gooding's (48.4%) at the forty-five day mark.

---

[6] A plaintiff may raise an inference of discrimination "by showing that the employer subjected him [or her] to disparate treatment, that is, treated him [or her] less favorably than a similarly situated employee outside his protected group." Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000). "When considering whether a plaintiff has raised an inference of discrimination by showing that she was subjected to disparate treatment, . . . the plaintiff must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." Id. (internal quotation marks and citation omitted). Neither party contests that these employees were similarly situated. Accordingly, this court assumes, without deciding, for the purposes of this argument that the employees mentioned were similarly situated to Gooding.

11

Carlos Flores started with a productivity rate of 30% and ended at 82.8% and was granted an extension. See Ex. 29 to Def.'s Mot. Summ. J. & App. A, fig. 9 to Def.'s Reply Br. Cathleen Higgins started at 56% and ended at 84% and was granted an extension. Ex. L to Pl.'s Opp.; App. A, fig. 10 to Def.'s Reply Br. Blarim Gashi started at 38.9% and ended at 102%. Ex. 35 to Def.'s Mot. Summ. J.; App. A, fig. 6 to Def.'s Reply Br. Juan Castillo started at 47% and ended at 90.6% and was granted an extension. Ex. M to Pl.'s Opp.; App. A, fig. 8 to Def.'s Reply Br. Teresa Dixon started at 24.4% and ended at 103%. Ex. 34 to Def.'s Mot. Summ. J.; App. A, fig. 6 to Def.'s Reply Br. Walgreens also provides evidence of other coworkers in the AKL Department who displayed similar results. Joe Brannigan started at 31.9% and ended at 109%. Ex. 34 to Def.'s Mot. Summ. J.; App. A, fig. 4 to Def.'s Reply Br. Edward Bland started at 56.6% and ended at 99.9%. Ex. 32 to Def.'s Mot. Summ. J.; App. A, fig. 3. Natalie Rosato started at 86.4% and ended at 108.1%. Ex. 36 to Def.'s Mot. Summ. J.; App. A, fig. 4 to Def.'s Reply Br.[7]

Third, Walgreens' treatment of Jessica Baquerizo, a pregnant employee at Walgreens approximately a year after Gooding was terminated, does not raise an inference of discrimination. Gooding argues that Walgreens should have moved Gooding to work in the "Tub Hospital," as was done with Baquerizo. Pl.'s Opp. at 9, 19. However, the situations are not comparable. Baquerizo, unlike Gooding, passed her Initial Review Period in the AKL Department. Def.'s L.R. 56(a)1 Stmt. ¶ 57; Ex. 38 to Def.'s Mot. Summ. J.; App. A, fig. 2 to Def.'s Reply Br. Baquerizo remained in the AKL Department and was able to meet her rate goals until she was approximately eight

---

[7] Each of these employees also finished his or her Initial Review Period with an accuracy rate similar to that of Gooding, as evidenced by the Exhibits and figures specific to each employee.

months pregnant.  Def.'s L.R. 56(a)1 Stmt. ¶ 58.  At that point, she informed Walgreens that she had a pregnancy-related restriction that prevented her from bending over to pick up items from bins in the AKL Department.  Id. ¶ 59.  Walgreens then transferred to the "Tub Hospital," where her condition would not be at issue.  Id.  Once there, she was subject to an Initial Review Period.  Aff. of Jenny Castle, dated Oct. 26, 2012 (Doc. No. 56-2) ("Oct. 26, 2012 Castle Aff.") ¶ 59.  She did not complete her Initial Review Period there because she took maternity leave before its completion.  Id.  Upon completing maternity leave, Baquerizo returned to her prior job in the AKL Department.  Id. ¶ 60.  Walgreens' treatment of Baquerizo was similar to its treatment of Gooding:  once notified of a pregnancy-related restriction, it transferred the employee to another job where the restriction would not be a problem.  If anything, the fact that Baquerizo was able to return after taking maternity leave is evidence that Walgreens did not engage in discrimination against Gooding because of her pregnancy.

There is no material issue of fact that the evidence in the record creates an inference of discrimination.[8]  Thus, Gooding has failed to establish a prima facie case of pregnancy or gender discrimination under Title VII or the CFEPA.

2.  Reason for Termination

Even if Gooding had made out a prima facie case of discrimination, Walgreens has met its burden of production to articulate a "legitimate, clear, specific[,] and non-discriminatory reason for discharging" Gooding.  Kerzer, 156 F.3d at 401.  Specifically, after Gooding was transferred to the AKL Department, she failed to meet the objectives

---

[8] Gooding also alleges that her supervisor intended to give her additional training, but never did so, and that he failed to complete a required "training matrix."  Pl.'s Opp. at 4.  However, these assertions do not come in the context of any specific argument about discrimination.  Gooding never explains how and why the failure to undergo additional training or the failure to adhere to a training matrix constitutes evidence of discrimination.

required by her job during the Initial Review Period. See, supra, Part IV.A. Walgreens gave Gooding the option to take leave and collect medical benefits until her pregnancy ended, after which she would be able to return to her job in the Shipping Department. However, Gooding never filed the paperwork that would have enabled her to do so, despite the fact that Walgreens contacted her in an attempt to prompt her to file the paperwork.[9] Def.'s L.R. 56(a)1 Stmt. ¶¶ 50–53.

Gooding argues that Walgreens' proffered reason for termination is pretext. To qualify as pretext, it must be "shown *both* that the reason was false, *and* that discrimination was the real reason." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993) (emphasis in original). Gooding argues that Walgreens' lack of a written policy against pregnancy discrimination and lack of a maternal leave policy are evidence of pretext. The premise of this argument is dubious. Walgreens has presented evidence that it has a comprehensive anti-discrimination and anti-harassment policy. Although the anti-harassment policy does not specify pregnancy in its statement, it states that "everyone has the right to work in a place free from verbal or physical harassment based on any personal characteristic." Ex. 1 to Def.'s Mot. Summ. J., at 7 (emphasis added). Additionally, as mentioned earlier, see, supra, n.9, the company's leave of absence policy specifies pregnancy as a situation qualifying an employee for leave. Regardless, no reasonable jury could conclude that a lack of a written policy against

---

[9] Gooding argues that she did not fill out the leave of absence paperwork because she was not "disabled." Pl.'s Opp. at 6, 19. However, Walgreens' written leave of absence policy states clearly that it is available to employees who require time off to deal with "health issues, family emergencies, personal matters, and similar situations," including "personal illness, pregnancy, or injury." Ex. 20 to Def.'s Mot. Summ. J. (emphasis added); see also Ex. 19 to Def.'s Mot. Summ. J. (providing disability leave for "[i]llness, injury, or pregnancy").

pregnancy discrimination or a lack of a maternal leave policy was evidence that Walgreens' proffered reason for terminating Gooding was false and a pretext.

Gooding also argues that Walgreens' treatment of Gooding's coworkers, compared to its treatment of her, is evidence of pretext. This court has already addressed this argument. See, supra, Part IV.A.1. Finally, Gooding argues that there is no evidence that Walgreens considered that Gooding's coworkers were slowing her down; and that this is evidence of pretext. Pl.'s Opp. at 18. No reasonable juror would consider this to be evidence of pretext. Gooding has produced no evidence that her coworkers were slowing her down or otherwise preventing her from achieving her goals. Moreover, Gooding's coworkers were subject to the same evaluation process during their Initial Review Periods, and Gooding has not presented any evidence that Walgreens considered whether any of them were slowed down by coworkers.

Because Gooding has failed to make out a prima facie case of pregnancy discrimination, and because Walgreens has proffered a non-pretextual, non-discriminatory reason for Gooding's termination, the court grants summary judgment for Walgreens on Counts 1 and 3.

B. Gender Discrimination

Counts 2 and 4 allege gender discrimination. Gooding argues that her gender discrimination claims should survive summary judgment because Walgreens "only disputes the pregnancy discrimination claims under federal and state law in its brief." Pl.'s Opp. at 19 n.3. This is incorrect. Walgreens expressly seeks dismissal of Gooding's gender discrimination claims. See, e.g., Def.'s Mem. Mot. Summ. J. at 2 ("[T]here is no basis to find that plaintiff was subject to any adverse treatment because

15

of her gender or pregnancy."); id. at 15–16 (stating standard for gender discrimination); Def.'s Mot. Summ. J. at 1 (seeking to dismiss Gooding's gender and discrimination claims). Moreover, claims of gender discrimination under Title VII and the CFEPA are both subject to the same three-step McDonnell Douglas analysis as pregnancy discrimination. Henderson v. General Electric Co., 469 F. Supp. 2d 2 (D. Conn. 2006) (Title VII); Jamilik v. Yale Univ., 362 Fed. Appx. 148, 150, 151 n.3 (2d Cir. 2009) (applying McDonnell Douglas analysis to Title VII gender discrimination claim, and noting that "CFEPA claims are governed by the same standards applicable to Title VII claims"). Gooding herself makes clear that her claims of gender discrimination are related to her claims of pregnancy discrimination. See Pl.'s Opp. at 14–15 (arguing that "a showing of pregnancy discrimination is also a showing of gender discrimination" and that "summary judgment as to the plaintiff's gender discrimination claims must be denied for the same reasons . . . that summary judgment with regard [to] her pregnancy discrimination claims must be denied."). Gooding offers no independent argument for or evidence of gender discrimination, apart from those offered in support of her claims of pregnancy discrimination. Accordingly, the court grants summary judgment for Walgreens on Counts 2 and 4 for the same reasons it granted summary judgment on Counts 1 and 3.

**V.     CONCLUSION**

For the foregoing reasons, Walgreens' Motion for Summary Judgment (Doc. No. 57) is **GRANTED**.  Summary judgment is entered in favor of Walgreens on all Counts.

**SO ORDERED.**

Dated at New Haven, Connecticut this 2nd day of July, 2013.

                                                                        /s/ Janet C. Hall
                                                                        Janet C. Hall
                                                                        United States District Judge